**CASE NO. 25-1143**

---

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

---

**TERRA WARGO,**

Plaintiff-Appellant,

v.

**MJR PARTRIDGE CREEK DIGITAL CINEMA 14**

Defendant-Appellee.

---

**ON APPEAL FROM**
The United States District Court
for the Eastern District of Michigan
Case No. 22-12063
Hon. F. Kay Behm, District Court Judge

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

**ORAL ARGUMENT REQUESTED**

---

SUBMITTED BY:

Carla D. Aikens, Esq.
Carla D. Aikens, P.L.C.
615 Griswold Street, Suite 709
Detroit, Michigan 48226
carla@aikenslawfirm.com
844.835.2993
*Counsel for Plaintiff-Appellant*

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. 3

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................................................. 4

JURISDICTIONAL STATEMENT ................................................................................... 4

STATEMENT OF THE ISSUES ...................................................................................... 5

FACTUAL BACKGROUND ............................................................................................ 6

SUMMARY OF ARGUMENT........................................................................................ 14

STANDARD OF REVIEW ............................................................................................. 14

ARGUMENT.................................................................................................................... 14

CONCLUSION................................................................................................................. 24

CERTIFICATE OF COMPLIANCE............................................................................... 25

CERTIFICATE OF SERVICE ........................................................................................ 25

ADDENDUM ................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Alaniz v. Zamora Quezada*, 591 F.3d 761 (5th Cir. 2009) .......................... 24

*Anderson v. Liberty  Lobby, Inc.*, 477 U.S. 242 (1986).............................. 14

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ................................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...................................... 14

*GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804 (6th Cir. 1999) ........... 14

*Kwan v. Andalex Grp.*, 737 F.3d 834 (2d Cir. 2013)................................. 23

*Lewis v. Humboldt Acquisition Corp.*,681 F.3d 312 (6th Cir. 2012)................. 24

*Miller v. Am. Airlines, Inc.*, 525 F.3d 520 (7th Cir. 2008).......................... 24

*Nassar v. University of Texas Southwestern Medical Center*, 133 S. Ct. 2517 (2013)..... 23

*Ponce v. Billington*,679 F.3d 840 (D.C. Cir. 2012)................................. 23

*Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298 (6th Cir. 2016)..................... 19

*State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433 (6th Cir. 2005) ............. 14

**Rules**

Fed. R. Civ. P. 56................................................................ 23

Fed. R. Civ. P. 56(a)............................................................. 14

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Appellant believes that oral argument will aid the Court because the appeal turns on the proper application of summary-judgment standards to a factually rich record of discrimination, harassment, and retaliation.

## <u>JURISDICTIONAL STATEMENT</u>

The district court exercised federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. The court entered final judgment on February 13, 2025 denying Plaintiff's Motion for Reconsideration. Appellant timely filed a notice of appeal on February 14, 2025. This Court has jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1. Whether the district court erred in granting Defendant-Appellee's Motion for Summary Judgment.

   > Plaintiff says: Yes

   > Defendant Likely says: No

2. Whether the district court erred in denying Plaintiff-Appellant's Motion for Reconsideration.

   > Plaintiff says: Yes

   > Defendant Likely says: No

**FACTUAL BACKGROUND**

Plaintiff-Appellant Terra Wargo ("Plaintiff") began working for Defendant-Appellee MJR ("Defendant") on November 29, 2015, in the Partridge Creek location in the concessions department and as an usher, when she was 17 years old. (Deposition of Terra Wargo, RE 39-2, Page ID # 268-69, 13:23-14:2.). Plaintiff was promoted to Supervisor in the Summer of 2016 and Assistant Manager in April of 2017. Plaintiff was promoted to a salaried, full-time manager in January of 2019 and held that position until the time of termination. (*Id*. at Page ID #269, 14:6-18). Plaintiff was promoted to Supervisor in the Summer of 2016 and Assistant Manager in April of 2017. Plaintiff was promoted to a salaried, full-time manager in January of 2019 and held that position until the time of termination. (*Id*. at Page ID #269, 14:6-18).

In early 2021, Paul Finnigan began working at Defendant's Partridge Creek locations as Patridge Creek General Manager. (*Id*. at Page ID #270, 18:20-24). When Finnigan first began working at Partridge Creek, he did not speak to other employees such as Plaintiff for about one week. (*Id*. at Page ID #270, 20:11-25). After other employees expressed concern about Finnigan's lack of interaction, Plaintiff reported the issue to Matthew Schwartz, the GM that Finnigan was replacing. (*Id*. at Page ID #270-71, 21:25-22:5).

Plaintiff presented concerns to Joel Kincaid, the Vice President of Operations and longtime colleague of Paul Finnigan.[1] (Deposition of Joel Kincaid Volume I, RE 39-3, Page ID #325-327,18:19-20:20). Joel Kincaid conducted an investigation into Ms. Wargo's complaints, but Kincaid was not informed about a "group of employees" approaching Melissa Hattle with "the

---

[1] Joel Kincaid was the same person who approved Mr. Finnigan's transfer to the Partridge Creek location. Kincaid had worked as Mr. Finnigan's supervisor since 2005 and he progressed upwards as Mr. Finnigan progressed upwards within the company.

concerns they present[ed] to [her] invol[ving] Paul." (*See* Deposition of Joel Kincaid Volume I, RE 39-3, Page ID#326, 19:17-22; RE 39-17, Page ID#474).

Plaintiff had a meeting with Joshua Jenson to discuss issues with the new ITS position, with which Finnigan was involved. (*See* Deposition of Terra Wargo, RE 39-2, Page ID #275, 38:5-7). Plaintiff expected Mr. Jenson to speak with Finnigan or Kincaid about the concerns she had raised. (*Id*. at Page ID #275, 38:18-20). This further supports her testimony that "I just didn't feel comfortable with [Paul Finnigan]." (*Id*. at Page ID #283. 72:12-15) Plaintiff felt the need to reach out to other male supervisors or individuals in power to try and remedy the issues with Finnigan's behavior. In response, Kincaid approached Finnigan and spoke to him about his management style and how to handle the transition to the new team and new building. (Deposition of Joel Kincaid Volume II, RE 39-4, Page ID#362, 7:17-22). Kincaid did not speak further with Plaintiff about her complaint, showing at the bare minimum an implicit deference given to the opinion or ability of male employees.

Finnigan repeatedly asked female subordinate employees, including Plaintiff, out to a bar, which made Plaintiff uncomfortable. Finnigan asked Hannah Venard to get drinks, as well. (Deposition of Paul Finnigan, RE 43-1, Page ID#526, 36:14-17). Finnigan's texts felt harassing to Plaintiff due to the repetitive nature. (Deposition of Terra Wargo, RE 39-2, Page ID #277-278, 49:14-50:14.) Paul Finnigan did not invite a male employee out for drinks in the same manner as he did Plaintiff and Ms. Venard. Further, he testified that the specific practice of inviting female subordinates out for drinks began at the Partridge Creek location. (*See* Deposition of Paul Finnigan, RE 43-1, Page ID#526). Plaintiff texted Venard about speaking to Kincaid after Finnigan invited multiple female subordinates out for drinks and after her prior complaints of Finnigan's

7

management style had gone unheeded. (Deposition of Terra Wargo, RE 39-2, Page ID #283, 72:20-24.)

On July 13, 2021 Finnigan again tried asking Plaintiff to go to a bar with him. (ECF No. 39-2). Finnigan attempted to get Plaintiff into a bar multiple times, despite her not expressing any desire to meet in such a location. These texts further harassed and made Plaintiff feel uncomfortable with statements such as "I will teach you all I know;" "I have a lot to show and teach…You'll see, I promise;" "I can show you everything… If you let me"; "I will teach you everything. You just have to trust me, any my methods. You will learn more than you think"; and "I wanted to treat you to dinner…" (RE 39-6, PageID#445-454). Further, this request was made during Plaintiff's shift. (Deposition of Terra Wargo, RE 39-2, Page ID #273, 31:13-16)

Finnigan, through repeated behavior, showed a lack of respect for his female subordinates by repeatedly stating that they needed to be taught how to do their jobs and attempting to meet them at bars, even during work hours. (*See* RE 39-6, PageID#445-456). Plaintiff told Finnigan that she felt he was lacking respect and communication with the employees. (Deposition of Terra Wargo, RE 39-2, Page ID#273, 32:4-9.). In response, Finnigan became hostile toward Plaintiff, raising his voice at her despite her attempts to do her job. (*Id*. at Page ID #273, 31). (*Id*. at Page ID #273, 32:18-33:10) This continued with him becoming physically aggressive by slamming a piece of paper down while continuing to berate Plaintiff. (*Id*. at Page ID #273, 32:18-33:2). Plaintiff attempted to leave Finnigan's office to defuse the situation, stating that the meeting was not productive, but Finnigan followed her into the office next door to continue arguing and yelling at Plaintiff. (*Id*. at Page ID #273, 33:8-33:10). Plaintiff testified that Finnigan blocked the door to her office. She stated "Multiple times I had attempted to physically leave by going towards the door and also verbally expressing that I wanted to leave, and he would not let me." (*Id*.).

8

Eventually, after following Ms. Wargo into the office and standing in front of the only exit to the office, Finnigan "allowed" Ms. Wargo to leave. (*Id*. at Page ID #273, 33:11-20) (Deposition of Paul Finnigan, RE 43-1, Page ID#572, 41:7). When Finnigan finally stopped using his body to block the door, including grabbing Plaintiff's arms for 5-10 seconds, Plaintiff made it outside, crying in her car in front of assistant manager Amanda Zonca. (*Id.* at RE 43-1, Page ID# 524, 28:21-25); Deposition of Terra Wargo, RE 39-2, Page ID#273, 33:14-25). Finnigan admitted at his deposition that Plaintiff was upset when leaving the office. (Deposition of Paul Finnigan, RE 43-1, Page ID #572, 41:21-22). Paul Finnigan was not given consent to touch Ms. Wargo and nothing in his responsibilities would require such physical contact.

On July 14, 2021, Plaintiff messaged Joel Kincaid to discuss the events of the night prior with Finnigan. She presented concerns to Joel Kincaid, the Vice President of Operations and longtime colleague of Paul Finnigan. (Deposition of Joel Kincaid Volume I, RE 39-3, Page ID #325-327, 18:19- 20:20) Joel Kincaid conducted the investigation into Ms. Wargo's complaints, but Kincaid was not informed about a "group of employees" approaching Melissa Hattle with "the concerns they presented to her involving Paul." (*See id*. at Page ID # 326, 19:17-22; RE 39-17, Page ID# 474). Joel Kincaid, only talked to Paul Finnigan about the complaints and did not speak with Ms. Wargo at all. Plaintiff further brought up other incidents of inappropriate conduct to Joel Kincaid who was involved all throughout the investigation. (RE 39-9, Page ID#459-461). Interestingly, Joel Kincaid made no mention of speaking to Paul Finnigan in his messages with Ms. Wargo on July 13, 2021. (*See* RE 39-7, Page ID# 457). Joel Kincaid mentions that another supervisor "Josh" brought up the incident to him not Paul Finnigan. (*Id*).

A. *Alterations Made to Ms. Wargo's Report*

Defendant conveniently failed to address the fact that a separate altered report was uncovered during the course of discovery that Defendant's HR Manager, Melissa Hattle, admitted herself and Joel Kincaid had the ability to access. (Deposition of Melissa Hattle, RE 39-5, PageID# 407, 26:10-17). MJR 00064 alters numerous things about Ms. Wargo's original report.(RE 43-2, Page ID#559). The report changes the date of submission, the date of the incident, the facts presented, and even changes the requested to "I am looking to submit my statement to the harassment allegation and my interpretation of events. I am not looking for any specific action against anyone listed in my statement." (*Id.*). However, the correct Harassment and Complaint Form requests "Based on his inappropriate behavior in the workplace, I would like to see him removed from the company. There is no resolution in which we could work within the same building after this incident took place." (*See* Plaintiff's Harassment and Complaint Documentation, RE 39-11, Page ID# 463). When asked about this discrepancy, Defendant's corporate representative could not answer why such a discrepancy occurred. (*See* Deposition of Joel Kincaid Volume I, RE 39-3, Page ID# 335, 28:3-8). Even the HR Manager, Melissa Hattle, only offered an explanation that maybe Ms. Wargo needed to clarify her report, but could not identify if Ms. Wargo had emailed this mysterious second report. (*See* Deposition of Melissa Hattle, RE 39-5, Page ID#404, 23:6-19, Page ID# 406, 25:12-15). Melissa Hattle further stated that the only other reason for such a report existing would be if someone was attempting to add or detract from the original report. (*Id.* at Page ID# 404, 23:23 – 24:8, Page ID# 406, 26:13-14), (Plaintiff's Response to Defendant's Motion for Summary Judgement, RE 42, Page ID# 496).

On July 15, 2021, Plaintiff met with Joel and Melissa Hattle, Human Resources Manager. Plaintiff began discussing the notes that Vennard had made for the conversation with Kincaid. (RE

39-2, Page ID # 275, 39:6-13; RE 39-9; RE 39, PageID # 242 ¶ 24). Plaintiff mentioned the uncomfortable text messages, such as him inviting her to dinner, and told him that she would read them or provide them if needed, but Plaintiff was told that it would not be necessary. (*Id.* at 39:14-19). Plaintiff indicated that Kyle Roney and Amanda Zonca were there when it happened, and that others heard them arguing during the incident. (RE 39-11). Plaintiff informed Kincaid and Hattle that she was not comfortable working with him but she agreed to do so, under the impression that it would only be for a brief time. (RE 39-2, Page ID # 278, 51:14-22).

On July 19, 2021, as requested, Plaintiff emailed Hattle and Kincaid to send them the notes she shared in person and address a few other issues. (RE 39-8, Page ID # 458; RE 39-9, Page ID # 459-61). In the email, Plaintiff also shared the situation where Finnigan followed her. (RE 39-8, Page ID # 458). Plaintiff ended the email stating she would be happy to provide any of the text messages to support the instances discussed. (*Id.*). Hattle responded shortly after Plaintiff's email and told her that any serious allegations needed to be reported using a form that was attached. (RE 39-20, Page ID # 477). After not hearing back regarding a question she had about the form, on August 2, 2021, Plaintiff filled out the form in detail and emailed it to Hattle. (RE 39-10, Page ID # 462). On August 3, 2021, Hattle responded and told Plaintiff that she and Kincaid would follow up shortly after payroll. (*Id.*)

### B. Forced Transfer and Termination

On August 19, 2021, Kincaid and Hattle came to tell Plaintiff the findings of the investigation, and Plaintiff was offered a transfer to MJR Marketplace Digital Cinema 20. (RE 39-2, Page ID # 280, 58:10-59:10). On September 20, 2021, Hattle sent Plaintiff documents regarding the investigation summary, her transfer letter, and a written warning to sign, in an apparent attempt to close her file. (RE 39-15, Page ID # 469). Defendant admits that it was aware of other instances

of complaints of sexual harassment against Finnigan, which Plaintiff was told about as well, including Finnigan grabbing the buttocks of another female employee, and Defendant apparently believed Plaintiff had assisted other individuals in filing a complaint about this situation. (RE 39 ¶¶ 29, 30, 31, 32, 33, 34 and 35).  On September 25, 2021, Plaintiff responded with the documents signed but wrote on both: "My signature is to acknowledge receipt of this document. I disagree with the contents of this document." (RE 39-12, PageID.464). On September 28, 2021 – just a month after being transferred – Plaintiff went into work and was greeted by the General Manager, Brandon Rogers, and Hattle. (RE 39-2, Page ID # 285, 289, 80:24-81:5, 95:3-4).

Ms. Wargo assisted Hannah Vennard with HR related tasks and questions she had about filing a report against Paul Finnigan for his actions towards another employee "Jocelyn." (*See* Deposition of Joel Kincaid Volume I, RE 39-3, Page ID#326, 19:17-22); RE39-13 Page ID # 465; RE 39-17, Page ID# 474). Paul Finnigan's conduct towards "Jocelyn" involved him "grabb[ing] [Jocelyn's] butt twice in the concession stand and [Jocelyn] told [Ms. Wargo] about their uncomfortable conversations that [Paul Finnigan] had with [Jocelyn]." (Deposition of Terra Wargo, RE 39-2, Page ID#284, 77:2-7).[2] Defendant improperly connected the two situations by referencing Defendant's deposition Exhibit P (RE 39-13, PageID # 465), which does not mention Jocelyn Rizo-Llamas anywhere in its contents.[3]

Ms. Wargo was terminated on September 28, 2021 for the following reasons:

---

[2] Melissa Hattle admits "there did not appear to be camera view of the specific location" where this conduct occurred. (Deposition of Melissa Hattle, RE 39-5, PageID # 396, 15:2-4).

[3] Defendant thereby made an improper logical jump in its motion without showing that the email was actually connected to that incident. In fact, the testimony of Hattle that was referenced by Defendant in its motion for summary judgment does not make that connection either and only reaffirms that Paul Finnigan had multiple complaints against him from separate women at the Partridge Creek location.

- 07/08/2021: Inappropriate comments made about GM in presence of another MJR Director
- 07/14/2021: Insubordination, disrespectful comments, and verbal outburst directed at supervisor
- 9/15/2021: Refusal to follow company policy and directive provided in corrective/disciplinary action

(Notice of Dismissal, RE 39-18, PageID#475). Defendant's notice of dismissal states the incidents involving Paul Finnigan **formed the majority** of the listed reasons for her dismissal. In fact, Melissa Hattle's testimony stated that Ms. Wargo was terminated for performance issues, as well, but Hattle could not identify anyone who had specifically complained about Ms. Wargo's performance. (*See* Deposition of Melissa Hattle, RE 39-5, PageID#407-408, 26-27; Plaintiff's Motion for Reconsideration, RE 50, Page ID#749-750).

### C.  *Defendant's Reporting Policy*.

The language of the policy included in Defendant's motion for summary judgment states "[in] the event that the General Manager is alleged to be personally involved in the facts forming the basis of the complaint, the individual shall report the incident in writing to Tony Penchoff." (RE 39-19, PageID # 476). Defendant has no policy that dictates what happened to Ms. Wargo here – that that the discussion of General Manager-involved complaints, where Tony Penchoff is unavailable, constitutes an immediately terminable offense. In fact, Defendant's corporate representative stated the policy tells employees to report incidents to HR. (Deposition of Joel Kincaid Volume I, RE 39-3, Page ID#332, 25:1-9). Defendant's corporate representative did not know what the reporting policy actually stated or prohibited at his deposition. (*See Id*. at Page ID# 332, 25:1-22; Plaintiff's Motion for Reconsideration, RE 50, Page ID#750).

## SUMMARY OF ARGUMENT

It would be a gross manifestation of justice for Plaintiff's claims to not be remanded to the trial court. Defendant admitted to the vast majority of the conduct at issue here, so there can be no question that it admits to terminating, in part, for aiding someone else with a sexual harassment claim, which is a direct violation of her civil rights. Defendant had no concern for Finnigan's conduct, letting it continue even after Plaintiff's issues, and then terminating her shortly thereafter. Summary judgment should never be granted in a situation such as this.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, viewing all evidence—and drawing every reasonable inference—in the light most favorable to the non-movant. *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Denials of motions for reconsideration under Fed. R. Civ. P. 59(e) are reviewed for abuse of discretion, but a district court necessarily abuses its discretion when it commits a clear error of law or relies on clearly erroneous findings of fact. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999).

## ARGUMENT

### A. *Plaintiff Can Establish A Claim For Hostile Work Environment Under the ELCRA.*

A hostile work environment claim requires a showing that the claimant: (1) was a member of a protected class; (2) was subjected to unwelcome sexual harassment; (3) the

harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Chambers v. Trettco, Inc.*, 463 Mich. 297, 311, 614 N.W.2d 910 (2000). Defendant's motion did not address the first factor and focused primarily on factors 2-5 in a combined argument. Defendant first stated that even if Plaintiff's allegations are accepted as true, the conduct would not rise to objectionable. (*See* RE 39 at p. 16). It continued by misstating Plaintiff's testimony about joining other General Managers for social interactions outside of the MJR premises. (*Id*).

Ms. Wargo stated that she met up with other General Managers outside of work because of the relationship and trust that had been built up over time. (RE 39-2, 49:19-50:14). She felt uncomfortable about Paul Finnigan inviting her to the bar without knowing her in that way, and nowhere in the record does Plaintiff's testimony lend itself to the implications that Defendant makes on page 16 of its motion, using words like "readily" to describe Ms. Wargo's willingness for social interaction with other managers. The use of the word "readily" insinuates that Ms. Wargo would engage in social meetings with managers "without hesitation."

Rather, the testimony and text messages Defendant attached to its motion are evidence to the contrary. Paul Finnigan attempted to get Ms. Wargo to go to a bar with him multiple times, despite her not expressing any desire to meet in such a location. These texts further harassed and made Ms. Wargo feel uncomfortable, with statements such as "I will teach you all I know;" "I have a lot to show and teach… You'll see, I promise;" "I can show you everything… If you let me;" I will teach you everything. You just have to trust me, any my methods. You will learn more than you think;" and "I wanted to treat you to dinner…" This evidence must be viewed in the light most favorable to her, and the Court must accept that she found these texts to constitute sexual harassment.

15

During the July 13, 2021 incident, Paul Finnigan became hostile to Ms. Wargo, raising his voice at her despite her being on the clock during a busy time. (Deposition of Terra Wargo, RE 39-2 at 31). This continued with him becoming physically aggressive by slamming a piece of paper down while continuing to berate Ms. Wargo. (*Id*. at 32-33). Ms. Wargo left the office, but Paul Finnigan followed her into the office next door to continue arguing and yelling. (*Id*.). Once in the office, Ms. Wargo felt trapped, testifying in her deposition that "[m]ultiple times I had attempted to physically leave by going towards the door and also verbally expressing that I wanted to leave, and he would not let me." (*Id*. at 34:8-10).

Finnigan eventually "allowed" Ms. Wargo to leave. (*Id.* at 41:7). When Finnigan finally stopped using his body to block the door[4], Ms. Wargo made it outside, crying in her car in front of assistant manager, Amanda Zonca.[5] This situation, along with others involving stalking-like behavior, made Ms. Wargo feel threatened. (*Id.* at 102:18-19). Finnigan further made sexual comments about Ms. Wargo to other employees, stating she would be "trouble." (*Id*. at 27:3-11). Further, Finnigan touched Ms. Wargo's arm for 5-10 seconds when he was not given consent to touch her, and nothing in his responsibilities would require such physical contact. (*Id.* at 28:21-25).

Lastly, Defendant claims this count fails because Defendant investigated the situation and took an appropriate remedial action by forcing Ms. Wargo to transfer. The investigation record is tainted for multiple reasons, and a reasonable juror could determine said investigation was

---

[4] Paul Finnigan also restrained Ms. Wargo by her arm for roughly five (5) to (10) seconds. (*Id.* at 28:21-25).

[5] Upon information and belief, Kyle Roney also witnessed Ms. Wargo leaving the office in tears. (*Id.* at 34:22-35:2). Finnigan admitted at his deposition that Ms. Wargo was upset when leaving the office. (*Id.* at 41:21).

nothing more than Defendant going through the motions. Defendant maintains that Finnigan was transferred solely to "implement new procedure adopted by the new owner." Ms. Wargo was offered a general manager position at Chesterfield, which would assumedly also require implementation of these alleged new procedures. Defendant even admits in its motion that she was qualified.  This begs the question as to why a manager who knew the location would be transferred away, when such new procedures would be required companywide and at every location. Further, the Partridge Creek location was actually further from Finnigan's residence. (*Id.* at 16-17).

Also, Defendant conveniently left out of its motion the fact that a separate altered report was uncovered during the course of discovery that Defendant's HR Manager, Melissa Hattle, admitted herself and Joel Kincaid had the ability to access. MJR 00064 alters numerous things about Ms. Wargo's original report. The report changes the date of submission, the date of the incident, the facts presented, and even changes the requested to "I am looking to submit my statement to the harassment allegation and my interpretation of events. I am not looking for any specific action against anyone listed in my statement."

However, the correct Harassment and Complaint Form requests "Based on his inappropriate behavior in the workplace, I would like to see him removed from the company. There is no resolution in which we could work within the same building after this incident took place."  When asked about this discrepancy, Defendant's corporate representative could not answer why such a discrepancy occurred. (*See* Deposition of Joel Kincaid Volume I, RE 39-3, Page ID # 335, 28:3-8). Even the HR Manager, Melissa Hattle, only offered an explanation that maybe Ms. Wargo needed to clarify her report, but could not identify if Ms. Wargo had emailed this mysterious second report. (*See id.*, Page ID # 330, 332, at 23:6-19, 25:12-14). Hattle further

17

stated that the only other reason for such a report existing would be if someone was attempting to add or detract from the original report. (*Id*. at 23:24-24:6; 26:13-14). [6]

When examining this, coupled with the fact that Ms. Wargo was transferred and then summarily terminated roughly one month apart, a reasonable juror could find that the alleged investigation was a sham that was heavily influenced by Joel Kincaid, who had worked with Paul Finnigan since 2005 and was heavily involved in all parts of the process. This feeling forced Ms. Wargo out of Partridge Creek because she did not have another source of income and her choices were to leave her location or work with her harasser. That is not an appropriate remedy.

The trial court issued an order on February 21, 2024, (RE 47, PageID # 662) granting Defendant's Motion for Summary Judgment. In that ruling, the Court determined that the conduct had not been shown to be "motivated by her gender" and was not severe or pervasive. (*Id*. at PageID # 683). Plaintiff included portions of the record in her response that showed Finnigan did not invite male employees to the bar. She further mentioned instances of physical contact on her person as well as that of another female employee. Simply put, Finnigan only engaged in touching and bar invitations with female employees, meaning his conduct was, by its very nature, motivated by gender.

"Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. The court cannot discount a nonmovant's affidavit for lack of credibility, and it **must** draw all reasonable inferences and resolve all genuine factual disputes in favor of the nonmovant." *The Analysis and Decision of Summary Judgment Motions: A monograph on Rule 56 of the Federal Rules of Civil Procedure*, The

---

[6] Hattle admitted that only she and Joel Kincaid had the ability to do this.

Federal Judicial Center at 48, (1991) www.ojp.gov/ pdffiles1/Digitization/134865NCJRS.pdf.[7]

In making that determination, the court is bound by the traditional allocation of functions between judge and jury:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for directed verdict. The evidence of the nonmovant **is to be believed**, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986) (emphasis added).[8] Simply put, all evidence presented by Ms. Wargo, including the text messages, are be believed and the reasonable inferences drawn therein. The inquiry is whether a plaintiff has presented sufficient evidence.

The entire situation, as set forth in the facts and this section, could easily show a hostile work environment when all reasonable inferences are drawn in Ms. Wargo's favor, as "whether harassment was so severe and pervasive as to constitute a hostile work environment [is] 'quintessentially a question of fact.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016). Accordingly, summary judgment on this claim should have been denied.

---

[7] The contributors to this publication were then Chief Justice Rehnquist, Judge Edward R. Becker of the U.S. Court of Appeals for the Third Circuit, Judge J. Harvie Wilkinson III of U.S. Court of Appeals for the Fourth Circuit, Judge Martin L. C. Feldman of U.S. District Court for the Eastern District of Louisiana, Judge Diana E. Murphy of the U.S. District Court for the District of Minnesota, Judge David D. Dowd, Jr. of the U.S. District Court for the Northern District of Ohio, Judge Sidney B. Brooks of the U.S. Bankruptcy Court for the District of Colorado, and Honorable Ralph Mecham the Director of the Administrative Office of the U.S. Courts.

[8] "In sum, *Anderson* tells trial courts to treat motions for summary judgment as they do **motions for directed verdict and judgment notwithstanding the verdict**: resolving all evidentiary disputes in favor of the opponent and determining whether under the substantive law, including the governing evidentiary standard, the opponent's evidence could support a verdict." The Federal Judicial Center at 61.

B. *Plaintiff Can Establish A Prima Face Case For Discrimination Under Title VII And The ELCRA.*

Defendant claimed that the test messages from Finnigan do not serve as a basis for Plaintiff's claims. Finnigan attempted to get Ms. Wargo to go to a bar with him multiple times despite her not expressing any desire to meet in such a location. These texts further harassed and made Ms. Wargo feel uncomfortable with statements such as "I will teach you all I know;" "I have a lot to show and teach… You'll see, I promise;" "I can show you everything… If you let me;" I will teach you everything. You just have to trust me, any my methods. You will learn more than you think;" and "I wanted to treat you to dinner…"

Further, this request was made during Ms. Wargo's shift. Upon information and belief, Finnigan only invited the two female salaried managers, Terra Wargo and Hannah Vennard, out to the bar. With that fact, these text messages can be seen as evidence of discrimination especially when taken in the context of the surrounding situation as well as the numerous harassment complaints that Paul Finnigan received.

Defendant maintained that Finnigan was transferred solely to "implement new procedure adopted by the new owner." As shown by MF #4 of Defendant's motion, Ms. Wargo was offered a general manager position at Chesterfield, which would assumedly also require implementation of these alleged new procedures. This begs the question as to why a manager who knew the location would be transferred away when such new procedures would be required companywide and at every location. Further, the Partridge Creek location was actually further from Finnigan's residence.

There is no real explanation for the original transfer, which leaves massive questions as to why such policies could not have been implemented by Ms. Wargo who was clearly qualified for

the Partridge Creek position. In the end, Ms. Wargo was transferred and then summarily terminated roughly one month apart, a reasonable juror could find that the alleged investigation was a sham that was heavily influenced by Joel Kincaid who had worked with Finnigan since 2005 and was involved heavily in all parts of the process. This feeling forced Ms. Wargo out of Partridge Creek, because she did not have another source of income and her choices were to leave her theatre or work with her harasser. That is not an appropriate remedy and was Defendant's attempt to terminate her position.

Defendant's notice of dismissal states the incidents involving Finnigan formed the majority of the listed reasons for her dismissal. Defendant's notice also lists the incident with Paul Finnigan as a reason for dismissal. Ms. Wargo was, by Defendant's own admissions in its MSJ Facts section, fired for helping someone else with their discrimination claim. This leads to another question if Ms. Wargo's actions were enough to been terminated almost immediately after being transferred, why was Paul Finnigan only placed on a PIP when multiple complaints had been received about his inappropriate behavior.  In fact, Melissa Hattle's testimony stated that Ms. Wargo was terminated for performance issues as well, but Hattle could not identify anyone who had specifically complained about Ms. Wargo's performance.

The language of the policy states "[in] the event that the General Manager is alleged to be personally involved in the facts forming the basis of the complaint, the individual shall report the incident in writing to Tony Penchoff." Defendant does not provide any policy that actually states that the discussion of said complaints when the General Manager is involved in the complaint, and Tony Penchoff is unavailable, constitutes and immediately terminable offense. In fact, Defendant's corporate representative stated the policy tells employees to report incidents to HR. The corporate representative, Joel Kincaid, further could not identify any policy that expressly

21

prohibits someone from talking to coworkers about their potential HR complaints. (RE  39-3, Page ID # 332, 25:10-18). A jury using these facts could easily determine evidence of discrimination as well as the pretextual nature of Defendant's reason for Ms. Wargo's termination.

### C.  Plaintiff Can Establish A Claim Of Retaliation Under Title VII And The ELCRA.

Plaintiff's arguments in the preceding sections also apply to this section. Defendant's arguments under this section are twofold: 1) Plaintiff did not engage in a protected activity; and 2) even if she did, she was not retaliated against. Defendant simply ignores the facts in its first argument of this section. Ms. Wargo sent emails, filed official forms, and had multiple meetings about her concerns with Finnigan, which were not being taken seriously. Defendant only mentions one report in its argument and ignores the numerous other communications that Ms. Wargo had with both Melissa Hattle and Joel Kincaid. Plaintiff was retaliated against as shown by the arguments in the preceding section of her response.

The Court's order *per se* dismissed Ms. Wargo's retaliation claim for failing to rebut Defendant's causation argument. (RE 47, PageID # 690). Plaintiff presented direct evidence of retaliation in that she was fired for **helping someone else with their discrimination claim**, as Defendant freely admits as if this conduct is not illegal. Ms. Wargo was terminated on September 28, 2021 for the following reasons:

- 07/08/2021: Inappropriate comments made about GM in presence of another MJR Director
- 07/14/2021: Insubordination, disrespectful comments, and verbal outburst directed at supervisor
- 9/15/2021: Refusal to follow company policy and directive provided in corrective/disciplinary action

The first two reasons deal with the harassment she complained of involving Finnigan while the last reason deals with her assistance of an individual filing a complaint.[9] Fed. R. Civ. P. 56, according to then Chief Justice Rehnquist and the Judicial Center, stated "[t]he nonmovant's failure to respond to a summary judgment motion in conformity with the requirements of Rule 56(e) does not automatically entitle the moving party to judgment." (The Judicial Center at 48). They continued further by explaining Rule 56 states that summary judgment shall be entered only if appropriate. *Id.* at 49. It was therefore improper for a determination to be made solely on the basis of a purported failure to address directly the causation argument presented in Defendant's Motion for Summary Judgment.

Additionally, the termination letter is evidence of direct retaliation and no such analysis should be performed under the burden shifting framework. The "but-for" causation standard does not require that retaliation be the "sole cause" of the action; instead, there can be multiple "but-for" causes, and retaliation need only be "*a* but-for" cause of the materially adverse action in order for the employee to prevail. *Nassar v. University of Texas Southwestern Medical Center*, 133 S. Ct. 2517, 2534 (2013); *see also Kwan v. Andalex Grp.*, 737 F.3d 834, 846 (2d Cir. 2013) ("'[B]ut-for' causation does not require proof **that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of a retaliatory motive**.") (emphasis added).

Circuit courts analyzing "but-for" causation under other EEOC-enforced laws also have explained that the standard does not require "sole" causation. *See, e.g.*, *Ponce v. Billington*,679 F.3d 840, 846 (D.C. Cir. 2012) (explaining in Title VII case where the plaintiff chose to pursue

---

[9] Stated another way, the last reason involved Ms. Wargo helping someone engage in a protected activity, which is itself protected activity.

only but-for causation, not mixed motive, that "**nothing** in Title VII requires a plaintiff to show that illegal discrimination was the sole cause of an adverse employment action") (emphasis added); *Lewis v. Humboldt Acquisition Corp.*,681 F.3d 312, 316-17 (6th Cir. 2012) (ruling that "but-for" causation required by language in Title I of the ADA does not mean "sole cause").[10]

In the instant matter, the very behavior Ms. Wargo complains of as retaliatory is two of the three basis for her termination. This, in accordance with the case law above, is therefore sufficient under a direct but-for theory of liability to survive summary judgment and no burden shifting framework is necessary. Plaintiff was terminated in part for engaging in protected activity, rendering Defendant's policy on the same illegal; accordingly, Defendant's motion for summary judgment should have been denied.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that this Honorable Court reverse the judgment below and remand for trial.

June 25, 2025                                   Respectfully submitted,

                                               /s/ Carla D. Aikens
                                               Carla D. Aikens, P.L.C.
                                               Counsel for Plaintiff–Appellant

---

[10] *See also Alaniz v. Zamora Quezada*, 591 F.3d 761, 777 (5th Cir. 2009) (rejecting defendant's challenge to Title VII jury instructions because "a 'but for' cause is simply not synonymous with 'sole' cause"); *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 523 (7th Cir. 2008) ("The plaintiffs do not have to show, however, that their age was the sole motivation for the employer's decision; it is sufficient if age was a "determining factor" or a "but for" element in the decision.").

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Fed. R. App. P. 32(a)(7) because it contains 5,398 words, excluding the material enumerated in Rule 32(f), as counted by Microsoft Word.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

<u>/s/ Carla D. Aikens</u>

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Document Description | Page Number of Electronic Record |
|---|---|---|
| RE 1 | Plaintiff's Complaint | PageID.1-19 |
| RE 39 | Defendant's Memorandum in Support of Motion for Summary Judgment | PageID.230-479 |
| RE 42 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | PageID.484-513 |
| RE 43 | Reply Brief in Support of Defendant's Motion to Dismiss | PageID.514-559 |
| RE 47 | Opinion and Order Granting Defendant's Motion for Summary Judgment | PageID.662-691 |
| RE 50 | Motion for Reconsideration | PageID.736-809 |
| RE 53 | Order Denying Motion for Reconsideration | PageID.889-892 |